UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Sandra Karen Hancock, ) | Civil Action No. 5:21-02906-KDW |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| Kilolo Kijakazi, Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff Sandra Karen Hancock ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). This action is proceeding before the undersigned Magistrate Judge by the parties' consent pursuant to 28 U.S.C. § 636 and Local Civil Rule 83.VII.02 (D.S.C.). For the following reasons, the Commissioner's decision is remanded.

I.   Relevant Background

   A.   Procedural History

On December 5, 2017, Plaintiff filed an application for DIB, Tr. 270-71, alleging disability since September 15, 2016, Tr. 332. Plaintiff's claim was denied initially and on reconsideration. Tr. 93, 110. On September 13, 2019, following an administrative hearing, ALJ Tammy Georgian issued a written decision finding Plaintiff was not disabled under the Act. Tr. 111-22. Plaintiff appealed the ALJ's decision and on August 20, 2020 the Appeals Council remanded the matter to the ALJ for further consideration of Plaintiff's impairments and maximum residual functional capacity ("RFC") and to receive supplemental evidence from a Vocational Expert ("VE"). Tr. 128-31.

In accordance with the Appeals Council's order, ALJ Georgian held a supplemental hearing on January 28, 2021. Tr. 38–52. On February 25, 2021, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. Tr. 13–30. The Appeals Council denied Plaintiff's request for review on July 9, 2021, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Tr. 1-5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed September 10, 2021. ECF No. 1.

B.     Plaintiff's Background

Plaintiff was born on January 9, 1962 and was 59 years old on the date of the ALJ's February 2021 decision. Tr. 270. In her December 7, 2017 form Disability Report-Adult, Plaintiff indicated that she obtained her GED in 1977,[1] did not attend special education classes, and had not completed any specialized job training, trade or vocational school. Tr. 325. Plaintiff listed her past relevant work ("PRW") as motel clerk (April 2011-Oct. 2012), restaurant manager (Jan. 2013-Sept. 2014), and grocery store clerk (May 2016-Sept. 2016). *Id.* She indicated that she stopped working on September 15, 2016 because of her conditions which she listed as back injury, arthritis, diabetes, and glaucoma. Tr. 324. Plaintiff indicated that she was 5'4" tall, weighed 137 pounds, and her conditions caused her pain or other symptoms. *Id.*

In a June 11, 2018 Disability Report-Appeal Plaintiff indicated changes in her medical condition that occurred April 9, 2018. Tr. 350. Plaintiff noted that she "[s]uffered a change from type I diabetes. I must inject insulin daily." *Id.* Plaintiff also indicated that she had been diagnosed with fibromyalgia by her rheumatologist. *Id.*

C.     Administrative Proceedings

---

[1] At the August 2019 hearing Plaintiff testified that she never obtained her GED. Tr. 76.

2

Plaintiff appeared with counsel at an administrative hearing on August 8, 2019, and again, via telephone, on January 28, 2021.[2] Tr. 38–80.

1.   August 2019 Hearing[3]

   a.   Plaintiff's Testimony

At the August 8, 2019 hearing, Plaintiff testified she lived alone in a townhouse. Tr. 57. She stated she had a driver's license but had not driven since she underwent surgery in January[4] due to medication side effects and a lack of mobility in her right arm. Tr. 58–59. In the previous two years, she had surgery on her neck and a second surgery on her shoulder. Tr. 64. Plaintiff testified she was unable to work because of pain in her neck, shoulder, and lower back. Tr. 63. She described her pain as constant and stated her medications made her foggy and sleepy. *Id.* At the time, Plaintiff was taking medication for diabetes, COPD, anxiety, and nerve pain. Tr. 66. Plaintiff testified she typically spent her day watching TV, visiting with neighbors, caring for her Chihuahua, and playing games on her tablet. Tr. 67–68. She stated she tried to do household chores, but needed help, especially with loading and unloading laundry. Tr. 68.

Plaintiff testified she previously worked as a cashier but she could not keep up with the production requirement and tended to drop things because of her arthritis. Tr. 70. Plaintiff then worked as a self-checkout clerk until she could no longer stand for four to six hours a day. *Id.* Plaintiff stated she had pain in her right shoulder a year or more before her January 2019 rotator cuff surgery. Tr. 73.

   b.   VE's Testimony

---

[2] The parties held the 2021 hearing via telephone due to the extraordinary circumstances of the COVID-19 pandemic. Tr. 41.
[3] The title page of the transcript indicates the incorrect hearing date; however, the transcription begins with the notation that the hearing commenced on August 8, 2019. *Compare* Tr. 53 *with* Tr. 55.

VE Ashley Haroldson Johnson testified at the hearing without objection. Tr. 76. The VE classified Plaintiff's past work as: waitress, Dictionary of Occupational Titles ("DOT") No. 311.477.030, SVP 3, semi-skilled, light; food deliverer, DOT No. 299.477.010, SVP 2, unskilled, medium; retail sales clerk, DOT No. 290.477.014, SVP 3, semi-skilled, light; and child monitor, DOT No. 301.677.010, SVP 3, semi-skilled, medium. Tr. 77. The ALJ asked Plaintiff about past reported work as a restaurant manager and Plaintiff testified that she was "kind of filling a position that wasn't [hers]." *Id.* The ALJ also asked about self-employment and Plaintiff indicated that she sold Avon products from a booth at an indoor flea market but she could not recall her earnings. Tr. 78.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work with the following limitations: "Further assume this individual can do light, can frequently sit, stand and walk, frequently climb ramps and stairs, but only occasionally ladders, ropes and scaffolds. Can frequently stoop, kneel, crouch and crawl, but must avoid concentrated exposure to hazards." Tr. 78. The ALJ asked if the individual could perform any of Plaintiff's past jobs and the VE responded the sales clerk and waitress jobs would match the hypothetical. Tr. 79. The VE affirmed that the other two jobs held previously by Plaintiff were at the medium level. *Id.*

Plaintiff's counsel had no questions for the VE and the hearing concluded. Tr. 79-80.

    2.    January 2021 Hearing

        a.    Plaintiff's Testimony

At the January 28, 2021 hearing, Plaintiff testified she stopped working in September 2016 because she was experiencing pain in her neck and could not move her neck or left arm. Tr.

---

[4] Plaintiff had shoulder surgery in January 2019, after the relevant time period for this action.

44-45. Before her surgery, her left hand was numb and she could not pick up anything. Tr. 46. She stated that, after her neck surgery, she was in a chair and could not return to work for eight months to a year. Tr. 45. She stated it took months for her to regain feeling in her arm. Tr. 46. Plaintiff testified that her neck and arm never fully recovered, despite physical therapy, and she could not get dressed on her own, shower, or drive. Tr. 45–46. Plaintiff stated that she still had pain, could not focus very well, had limited range of motion in her arms, and could not close her hands all the way. Tr. 46. Plaintiff testified she also experienced swelling in both hands and wrists due to arthritis and had trouble reaching and lifting her hand over her head. Tr. 47–48. She testified that, during the relevant period, she had trouble sitting, could not stand for very long, could not go to the grocery store or walk to the mailbox, could not bend over or tie her shoes, and could not lift her 10-pound dog. Tr. 48–50.

      b.    VE's Testimony

VE Robert Brabham was available to testify. Tr. 42. However, after Plaintiff completed her testimony the ALJ indicated that she did not need testimony from the VE. Tr. 51. With nothing further from Plaintiff's counsel the hearing was adjourned. Tr. 51-52.

II.    Discussion

    A.    The Commissioner's Findings

In her decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2018.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 15, 2016, through her date last insured of June 30, 2018 (20 CFR 404.1571, et seq.).

3. Through the date last insured, the claimant had the following severe impairment: cervical degenerative disc disease status post ACDF (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), consisting of lifting or carrying no more than twenty pounds with frequent lifting or carrying of objects weighing up to ten pounds. The claimant also can frequently sit, stand, and walk. She is able to frequently stoop, kneel, crouch, crawl, and climb ramps and stairs, but only occasionally climb ladders, ropes, and scaffolds. She must avoid concentrated exposure to hazards.

6. Through the date last insured, the claimant was capable of performing past relevant work as a waitress and retail sales clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 15, 2016, the alleged onset date, through June 30, 2018, the date last insured (20 CFR 404.1520(f)).

Tr. 19–30.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

6

> death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his

C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d

---

impairment is disabling at Step 3).

846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    C.    Analysis

Plaintiff alleges the ALJ failed to properly (1) consider Listing 1.04, (2) explain her RFC findings, (3) consider the severity of Plaintiff's glaucoma, arthritis, and fibromyalgia, and (4) evaluate Plaintiff's subjective symptoms. Pl.'s Br. 15–32, ECF No. 15. The Commissioner contends the ALJ's decision complies with the applicable regulations and is supported by substantial evidence. Def.'s Br. 9–21, ECF No. 17.

        1.    Listing Analysis

Plaintiff argues the ALJ did not appropriately consider whether she met the requirements for disability under Listing 1.04A, despite finding she suffered from the severe impairment of cervical degenerative disc disease status post ACDF. Pl.'s Br. 15. In response, the Commissioner

9

argues that, when read as a whole, the ALJ's decision provides a sufficient discussion of the evidence to support a finding that Plaintiff did not meet Listing 1.04A's requirements. Def.'s Br. 9.

In determining whether a claimant's impairments satisfy the requirements for a relevant listing, the ALJ must identify the relevant listed impairment or impairments, discuss the relevant evidence, and compare that evidence to the requirements in the applicable listings. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). "In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." *Peck v. Colvin*, No. 8:12-cv-02594-DCN, 2014 WL 994925, at *12 (D.S.C. Mar. 13, 2014) (quoting *Cook*, 783 F.2d at 1172). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Id.*; *see also Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

Listing 1.04A provides:

1.04 Disorders of the Spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 104.[6]  A claimant does not need to show that all of the medical criteria in paragraph A were present at the same time; rather, a claimant can satisfy the

---

[6] The Social Security Administration recently updated the way it evaluates many back and neck impairments. The Listing of Impairments was revised after the ALJ issued a decision in this case. The former Listing 1.04A was revised and is now Listing 1.15, effective April 2, 2021. The revised listing requires additional criteria be met prior to a finding of disability. *See* 85 Fed. Reg.

requirements of 1.04A if evidence shows the medical criteria were present within a continuous 12-month period. Social Security Acquiescence Ruling ("AR") 15-1(4).

The ALJ found Plaintiff's cervical degenerative disc disease status post ACDF to be a severe impairment. Tr. 19. At step three, the ALJ found:

> The severity of the claimant's physical impairments do not meet or medically equal the criteria of 1.04. In December 2016, the claimant underwent an MRI of the cervical spine that revealed multilevel chronic cervical spondylosis with protrusion (Ex. 4F, 25). In 2017, the claimant underwent a C4-C7 spinal fusion surgery (Ex. 1F, 6; Ex. 2F, 2). In November 2018, the claimant underwent an additional MRI of the cervical spine that revealed postsurgical changes with improvement in the caliber of the spinal canal (Ex. 12F, 32). Therefore, there is no indication in the record that the claimant is experiencing compromise of the nerve root or spinal cord, which is required by 1.04.

Tr. 23.

Plaintiff argues the ALJ ignored evidence of nerve root compromise during the relevant period. Pl.'s Br. 15. The undersigned agrees. In December 2016, Plaintiff's physician, Dr. Dan Muntean, ordered an MRI to evaluate Plaintiff's ongoing cervical degenerative disc disease with radiculopathy and muscle spasms and persistent neck and left arm pain. Tr. 490. Plaintiff reported experiencing constant pain and spasms shooting into her neck and radiating down her left arm, along with some numbness. Tr. 501, 503. The MRI showed disc narrowing and desiccation compatible with degenerative disc disease at the C4-5 level, along with posterior disc protrusion creating mild to moderate spinal stenosis with mild cervical cord impingement, and bilateral foraminal stenosis with possible nerve root impingement. *Id.* In addition, the MRI showed mild posterior protrusion with mild to moderate spinal stenosis and possible cervical cord impingement and probable left-sided nerve root impingement at the C6-7 level. *Id.*

---

78164-01, 2020 WL 7056412 (Dec. 3, 2020). If a court reverses a final decision and remands a case for further administrative proceedings after the effective date of the final rules, the final rules will be applied to the entire period at issue in the decision made after the court's remand.

Dr. Muntean referred plaintiff to a neurosurgeon, Dr. Eugene Giddens. Tr. 783. In January 2017, Plaintiff told Dr. Giddens she had been experiencing severe neck pain radiating down her left arm for the prior two months with little relief from medications or physical therapy. *Id.* On examination, Dr. Giddens noted diffuse weakness in the upper extremities and restricted spinal range of motion. Tr. 784. He assessed cervical radiculopathy, ordered an epidural steroid injection, and opined Plaintiff would likely need an anterior cervical discectomy and fusion. *Id.* Plaintiff opted to pursue surgery and, in a March 2017 pre-op visit, Dr. Giddens noted slight weakness in both upper extremities and full neck range of motion. Tr. 781. On March 8, 2017, Plaintiff underwent anterior cervical discectomies at C4-7 with placement of interbody mechanical cages and C4-7 anterior cervical spinal plating. Tr. 921–92.

For over a year after the surgery, Plaintiff continued to experience pain in her neck and shoulder, muscle spasms, reduced range of motion, soreness, and stiffness. Tr. 779–80 (March 23, 2017 treatment record noting decreased range of motion, neck pain, and muscle spasm), 776–77 (April 20, 2017 treatment record noting Plaintiff's arm pain was mostly resolved, she was still experiencing pain into her shoulder, good range of motion and upper extremity strength, and cervical radiculopathy had "improved" since surgery), 774–75 (June 15, 2017 treatment record indicating radicular symptoms had resolved, still experiencing stiffness and soreness, good range of motion and upper extremity strength, "recovering as expected"), 498 (August 16, 2017 treatment record noting Plaintiff was off pain medication and experiencing chronic neck pain rated 5/10), 495 (December 5, 2017 treatment record noting increased pain and stiffness in the neck and shoulder rated 6/10 not responding to Tramadol), 601–02 (January 23, 2018 treatment record noting increased pain in the bilateral wrist, neck, and shoulder rated 7/10, losing range of

---

85 Fed. Reg. 78164, n.2.

motion in hands, medication not effective), 599–600 (March 5, 2018 treatment record noting neck, wrist, and shoulder pain rated 6/10), 528 (April 10, 2018 treatment record noting Plaintiff's surgery relieved her left arm nerve pain but she continued to experience neck pain and stiffness), 597–98 (April 25, 2018 treatment record noting neck and shoulder pain rated 4–5/10 and limited range of motion), 595–96 (May 2, 2018 treatment record noting Plaintiff's pain had improved, but she was still experiencing back and joint pain), 593–94 (June 20, 2018 treatment record assessing shoulder and neck pain rated 5/10), 548 (July 3, 2018 treatment record noting complaints of right arm pain and increasing Plaintiff's medication).

The ALJ's listing analysis skips from Plaintiff's March 2017 surgery to a November 2018 MRI, with no reference to evidence from the period in between—which is the relevant period for this matter. *See* Tr. 23. Instead, the ALJ relies almost entirely on Plaintiff's November 2018 MRI, stating, "In November 2018, the claimant underwent an additional MRI of the cervical spine that revealed postsurgical changes with improvement in the caliber of the spinal canal. Therefore, there is no indication in the record that the claimant is experiencing compromise of the nerve root or spinal cord." Tr. 23. In November 2018, Plaintiff followed up with Dr. Giddens and complained of increased posterior neck pain, predominantly on the right side, and right shoulder pain and discomfort. Tr. 768. Dr. Giddens noted a recent MRI, the one relied on by the ALJ, did not "show any convincing pathology," but examination revealed Plaintiff to be in "obvious discomfort" with tenderness to palpation along the right side of her neck and some diffuse weakness in the area. Tr. 769. Dr. Giddens assessed cervicalgia. *Id.* Plaintiff returned later that month with continued complaints of neck and right shoulder pain. Tr. 765. On examination, Dr. Giddens noted some posterior cervical tenderness, some difficulty with flexion, extension, and lateral rotation of the neck, and good upper extremity strength. Tr. 766.

This time, he assessed cervical radiculopathy and referred Plaintiff to a pain management specialist for an epidural steroid injection. *Id.* Thus, despite finding Plaintiff's MRI did not definitively show nerve root compromise, Plaintiff's treating neurosurgeon assessed cervical radiculopathy and adjusted Plaintiff's treatment plan accordingly, suggesting at least some evidence of impingement.

The Commissioner asserts the decision as a whole supports the ALJ's listing analysis. Def.'s Br. 11. In her discussion of Plaintiff's degenerative disc disease, the ALJ summarized Plaintiff's pre-operative symptoms and her surgery, then includes three sentences regarding the post-operative period from March 2017 until the November 2018 MRI. Tr. 25. Concerning this period, the ALJ states:

> The record reflects a satisfactory post-operative appearance and diagnostic imaging (Ex. 1F, 6; 2F, 2). Following the surgery, the claimant reported improvement in her extremity pain and weakness (Ex. 2F, 4; 5F, 4). She also demonstrated good range of motion and good upper extremity strength (Ex. 2F, 3; 5F, 5).

*Id.* However, the progress notes the ALJ cites also contain evidence of continued symptomology. *See* Tr. 438–39 (Ex. 2F, 2–3—stating Plaintiff's radicular symptoms have resolved but she is still experiencing some neck stiffness and soreness and continuing to assess cervical radiculopathy), 440–41 (Ex. 2F, 4—stating "Radicular symptoms have improved since the surgery. Still having considerable neck stiffness and soreness, [and] shoulder pain." And continuing to assess cervical radiculopathy), Tr. 517–18 (Ex. 5F, 4–5—consultative examination noting Plaintiff did not have radicular symptoms or weakness at that time but did have moderately restricted cervical range of motion).

Much of the evidence the ALJ relies on is dated after Plaintiff's June 2018 DLI. *See id.* (citing records from November 2018 through 2019). The only record from the relevant period the

ALJ discusses at any length is a March 2018 consultative exam. *See* Tr. 26 (discussing Tr. 515–18). The consultative examiner found Plaintiff exhibited moderately restricted cervical range of motion but did not have any radicular symptoms or upper extremity weakness at that time. Tr. 518. In reference to these findings, the ALJ found Plaintiff's reduced range of motion "would be expected of someone with a multilevel cervical fusion." Tr. 26. However, the ALJ also repeatedly noted Plaintiff's "improved range of motion" as support for her RFC finding. *See* Tr. 26, 29.

Most importantly for this discussion, nowhere in the decision did the ALJ compare Plaintiff's symptoms or the related medical evidence to the listed criteria. *See Cook*, 783 F.2d at 1172–73 (finding an ALJ should identify the relevant listed impairments and then compare each of the listed criteria to the evidence of the claimant's symptoms where there is ample evidence supporting listing-level severity). Indeed, the ALJ fails to identify the elements of Listing 1.04A, other than nerve root compromise. While "[t]here is no requirement . . . that an ALJ provide an exhaustive point-by-point breakdown of every listed impairment," her "decision as a whole" must provide a "coherent basis" for her step three determination. *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). Here, even considering the entirety of the ALJ's decision, the undersigned cannot piece together a coherent listing analysis without impermissibly reweighing the evidence.

Without further explanation of how the ALJ considered the evidence in the record in the context of Listing 1.04A, the court cannot determine whether the ALJ's decision was supported by substantial evidence. *See, e.g., Owens v. Saul*, No. 8:19-01180, 2020 WL 1067499, at *2 (D.S.C. Feb. 14, 2020), *adopted by* 2020 WL 1065919 (D.S.C. March 5, 2020) ("The ALJ's conclusory finding at Step 3 and her failure to analyze the [relevant] record evidence in the

context of [the relevant listing] precludes meaningful judicial review of this issue."); *Reynolds v. Berryhill*, 387 F. Supp. 3d 642, 644 (D.S.C. May 21, 2019) ("Courts have repeatedly held that '[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing.'") (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). Accordingly, the undersigned remands this action for further consideration of Listing 1.04A. *See Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess about how the ALJ arrived at his conclusions").

III.   Conclusion

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, the Commissioner's decision is reversed and remanded for further administrative action as detailed within.

IT IS SO ORDERED.

November 22, 2022                                          Kaymani D. West
Florence, South Carolina                                   United States Magistrate Judge